UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

|  |  |
|---|---|
| THE DIRECTORS AND SHAREHOLDERS OF JMV FIXED INCOME ARBITRAGE PERFORMANCE PARTNERS, LTD., THE DIRECTORS AND SHAREHOLDERS OF REGENMACHER HOLDINGS LIMITED, AND SIAM CAPITAL MANAGEMENT LTD. <br><br> Plaintiffs, <br><br> v. <br><br> IAN RATNER, AS INTERIM RECEIVER FOR JMV FIXED INCOME ARBITRAGE PERFORMANCE PARTNERS, LTD. and REGENMACHER HOLDINGS LIMITED, <br><br> Defendant. | Case No.: |

## COMPLAINT

Plaintiffs and Intervenors in related action case number 4:08-CV-00495, the Directors and Shareholders of JMV Fixed Income Arbitrage Performance Partners, Ltd., Directors and Shareholders of Regenmacher Holdings Limited, and SIAM Capital Management Ltd, by their attorneys, Shook, Hardy & Bacon LLP, as and for their Complaint in the above-referenced action, state and allege as follows:

## NATURE OF THE ACTION

1. Plaintiffs, the Directors and Shareholders of JMV Fixed Income Arbitrage Performance Partners, Ltd. and the Directors and Shareholders of Regenmacher Holdings Limited (hereinafter collectively referred to as the "Directors and Shareholders"), together with SIAM Capital Management Ltd. ("SCML"), have intervened and seek to enjoin the interim

receiver appointed for JMV Fixed Income Arbitrage Performance Partners, Ltd. ("JMV-FIA") and Regenmacher Holdings Limited ("RHL") by the Eastern Caribbean Supreme Court High Court of Justice, Anguilla Circuit ("Anguillan Court"), and demand other relief set forth more fully in Plaintiffs' Order to Show Cause for Intervention and to Vacate Temporary Restraining Order filed in case number 4:08-CV-00495-HFS, an action by Defendant to freeze the bank accounts of JMV-FIA and RHL in Missouri.

2.  The Anguillan Court ordered the appointment of the Defendant Ian Ratner as interim receiver of JMV-FIA and RHL on July 9, 2008 ("Receiver"), after an *ex parte* hearing brought by a Liechtenstein Foundation, Bagani Stiftung ("Bagani"). The factual basis of the application by Bagani was false and misleading.

3.  On July 10, 2008, the Receiver, using the powers obtained in the Anguillan proceeding, then filed a Verified Complaint for declaratory judgment, accounting, constructive trust and injunctive relief seeking an *ex parte* order to freeze bank accounts belonging to JMV-FIA and RHL based on what the Receiver represented to the Court was an imminent threat to the assets.

4.  Plaintiffs then sought to intervene in that action and then to: (a) join Bagani to the action pursuant to Rule 19; (b) allow expedited discovery; (c) enjoin the Receiver from further restraining the funds; (d) compel the Receiver to pay fees due and owing to SCML and legal fees for the Plaintiffs; and (e) compel the Receiver to post an appropriate bond for resulting damage because of the temporary restraining order.

5.  Plaintiffs by and through this Complaint seek monetary damages for the injuries already suffered as a result of the Defendant's actions and for injunctive relief.

6.  The temporary restraining order sought and received by the Defendant prevents the directors of JMV-FIA and RHL from exercising their fiduciary duties, compromises the very

2

existence of those companies, and imminently threatens the existence of their investment manager, SCML. Moreover JMV-FIA and RHL's shareholders' assets are being actively depleted without regard for the best interests of the companies or the beneficiaries thereof.

7. As a result of the restraining order, the viability of each company has been cast into serious doubt. The Receiver knew or should have known before acting that the restraining order would result in harm to the Plaintiffs and to their assets, and disregarded his duty to both.

## II.

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

**A.    The Parties**

8. JMV-FIA is a company incorporated on July 26, 2004, in Anguilla for the purpose of doing business outside of the jurisdiction of Anguilla. The directors of JMV-FIA are United States citizens Jayme Colter and Jonathan P. Knight and Bahamian citizen Tamishca Ambrister.[1] JMV-FIA is not licensed to do business in Anguilla and has never done business in Anguilla.

9. Regenmacher Holdings Limited ("RHL") is a company incorporated on July 26, 2004, in Anguilla for the purpose of doing business outside of the jurisdiction of Anguilla. The directors of RHL are Ms. Colter and SIAM Capital Management Ltd ("SCML"), a Bahamian investment manager and financial services provider. RHL is not licensed to do business in Anguilla and has never done business in Anguilla.

10. Hereinafter, the Directors and Shareholders of JMV-FIA and RHL as identified in Paragraphs 8 and 9 above, will collectively be referred to as the "Directors and Shareholders."

---

[1] The Receiver, upon information and belief, may be in the midst in Anguilla of removing the Directors of both JMV-FIA and RHL and personally taking on that role, again without notice to any interested party. There is no jurisdiction over SCML in Anguilla.

3

11. SCML is a licensed Financial Services Provider incorporated in the Bahamas in 2000, authorized to conduct both international business and domestic business in the Bahamas. SCML has never conducted business in Anguilla.

12. SCML is the sole shareholder of JMV-FIA and RHL. SCML serves as a Director of RHL.

13. Plaintiff Ian Ratner, CPA (the "Receiver"), purported interim receiver for JMV-FIA and RHL is, upon information and belief, a United States citizen and a resident of the State of Georgia.

### B. Jurisdiction and Venue

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this district.

15. This Court has specific personal jurisdiction over the Defendant because he has taken advantage of this Court's power to bring action against other parties related to this proceeding.

16. This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §1332 because complete diversity of citizenship exists and the amount in controversy exceeds $75,000.00.

### C. Other Relevant Parties

17. ("BAWAG") is one of the largest banks in Austria. At the beginning of its relationship with SCML, BAWAG was known as a solid E.U. financial institution and at one point was rated Aa3 by Moody's.

18. BAWAG was privately owned by two institutions, Österreichischer Gewerkschaftsbund ("ÖGB") and the Bayerische Landesbank. Bayerische Landesbank was an

4

Case 4:08-cv-00538-HFS   Document 1   Filed 07/25/08   Page 4 of 19

AAA rated bank owned by the German State of Bavaria. In 2004, ÖGB became sole shareholder of BAWAG.

19. Recently, BAWAG's top officers and directors have been convicted of serious criminal activity, including bank fraud, in Austria. On June 2, 2006, BAWAG entered into a non-prosecution/forfeiture agreement with the United States Department of Justice ("DOJ") in which it admitted its complicity, with ÖGB, in a wide-ranging fraud involving Refco, Inc. and several of its subsidiaries and affiliates ("Refco"). Refco is a New York financial services company, primarily known as a broker of commodities and futures contracts.

20. Bensor Stiftung ("Bensor") is a Liechtenstein Foundation acting, upon information and belief, on behalf of BAWAG.

21. ÖGB is the Austrian Federation of Trade Unions, roughly equivalent to, but more comprehensive in scope than, the AFL-CIO in the United States. ÖGB has 1.3 million members (in a nation with a population of seven million).

22. The ÖGB, on June 2, 2006, entered into a non-prosecution/forfeiture agreement with DOJ in which it admitted its complicity in a wide-ranging fraud whose details are set forth herein.

23. Upon information and belief, ÖGB is currently under criminal investigation for a pervasive tax fraud and a wide-ranging political corruption scheme involving Austria's ruling party.

24. Bagani Stiftung ("Bagani"), is a Liechtenstein foundation that initiated the *ex parte* court action in Anguilla that resulted in the appointment of the Defendant as interim Receiver for JMV-FIA and for RHL. The beneficiary of Bagani is ÖGB and, at all times relevant, Bagani acted and is acting on behalf of ÖGB.

5

25.     Upon information and belief, Bagani was formed on August 22, 2005, so that, six weeks later, on October 10, 2005, it could be used as an instrument in a series of fraudulent transactions involving BAWAG, ÖGB and others as described more fully herein.

### D.     BAWAG, Lichtenstein Foundations, JMV-FIA and RHL: The Zero Coupon Notes Loan Transaction

26.     In April 2004, BAWAG executives with whom SCML had previously engaged in business, asked SCML to propose a plan to reorganize BAWAG's numerous hedge fund investments that BAWAG claimed had been made on behalf of clients of the bank.

27.     BAWAG wanted the investments structured as loans to companies independent of BAWAG in exchange for zero coupon performance linked loan obligations or notes.

28.     BAWAG's outside counsel, Harry Neubauer, was responsible for the final preparation of, and in fact drafted and prepared, all of the transactional documents. The loan transaction became known as the Joint Manager Venture ("JMV") program.

29.     The total program involved approximately $455 million. The portion of the loan transactions that is relevant to the instant action was $50 million, an amount that was evidenced by the JMV-FIA Note which was managed by SCML.

30.     On October 28, 2004, JMV-FIA issued a zero coupon bond ("ZCPPC") of a specific maturity and face amount to accomplish the proposed loan transaction. BAWAG placed the bond with Bensor. JMV-FIA then borrowed $50 million from Bensor, which received a Note maturing October 29, 2015. Cash proceeds from the loan were wired to JMV-FIA's company account.

31.     As agreed, JMV-FIA then transferred the $50 million in loan proceeds from to RHL under an Asset Holding and Management Agreement. Also as agreed, RHL engaged SCML under an Investment Advisory Agreement to direct the investment of the $50 million.

32. Things proceeded in this manner for approximately one year.

33. In late August or early September 2005, BAWAG informed SCML that it wanted to restructure the JMV program as of early October, 2005. BAWAG wanted the JMV-FIA to take back the existing bond purchased by Bensor, and to issue a new bond with the same face value and maturity to a different foundation, Bagani. As first proposed, BAWAG was to transfer, through Bensor, its interest in the loan proceeds represented by the JMV-FIA Note to ÖGB, represented by Bagani.

34. Upon information and belief, Bagani was established on August 22, 2005, for the purpose of completing this transaction.

35. SCML recommended that it would be most efficient if the bondholder simply followed U.S. transfer standards by executing bond powers and selling the existing note to the new foundation.

36. BAWAG specifically said it wanted a different arrangement and drafted documents for its own purposes.

37. If loan transaction documents were constructed as SCML thought had been originally contemplated, and the underlying fund transfers had been executed, the loan proceeds of the JMV-FIA Note would have been due and owing to ÖGB through Bagani in 2015, rather than being due and owing to Bensor on behalf of BAWAG.

38. The transaction as SCML believed was originally contemplated, however, was never consummated.

39. Documents drafted by BAWAG's outside counsel and executed in 2005 do not transfer, or purport to transfer, the loan proceeds of the 2004 JMV-FIA Note from Bensor to Bagani.

40. Notwithstanding the plain language of the existing transaction documents obligating JMV-FIA to deliver the loan proceeds to Bensor in 2015, Bagani claims to be the owner of the assets delivered to JMV-FIA by Bensor.

41. SCML and the other Plaintiffs have literally spent the past two years seeking appropriate proof of Bagani's claim from its representatives, and have been stymied in those efforts.

E. **The Truth About Refco, BAWAG and ÖGB Exposed**

42. On or about October 10, 2005, a month after going public, Phillip R. Bennett, Refco's CEO, took a $430 million loan from BAWAG and paid it to Refco to cover some undisclosed related party loans to another Bennett company. Refco's Board then put Bennett on a leave of absence and promptly announced that it had falsely reported its balance sheet for the last several years. Refco declared bankruptcy one week later.

43. BAWAG was exposed to severe scrutiny as a result of its relationship with Refco. The scrutiny brought to light BAWAG's and its senior executives' complicity with Refco and with ÖGB. It also brought allegations, which became the subject of a series of criminal prosecutions in Austria that have now resulted in the conviction of literally every top level BAWAG and ÖGB official, including those officials who induced SCML to enter into the above-identified transactions, that BAWAG was hiding its own investment losses and conspiring with its sole shareholder, ÖGB.

44. It is now clear that SCML was unwittingly misled and used by BAWAG, ÖGB, Bensor, Bagani and Refco to assist their efforts to hide BAWAG's losses from auditors, government officials and investors.

45. Upon information and belief, the JMV transactions of October 10, 2005, were designed to channel money from ÖGB to BAWAG in order to cover up and hide BAWAG's extensive and undisclosed trading losses.

46. Bagani, upon information and belief, was literally created to perpetrate a fraud, as a conduit for taking money and transferring it to BAWAG to cover its trading losses.

47. In June 2006, BAWAG and ÖGB entered into a non-prosecution/forfeiture agreement with DOJ in which each admitted its complicity with the Refco fraud. Pursuant to that agreement, BAWAG and ÖGB, among other things, forfeited at least $675 million to settle various claims by victims of the fraud. BAWAG and ÖGB admitted that it assisted Refco in hiding millions of dollars of Refco losses by a series of year-end cover-up and other transactions. BAWAG and ÖGB further admitted that they received assistance from Refco in concealing BAWAG's own investment losses.

48. Further evidence of the fraud committed by BAWAG and ÖGB has been developed during the ongoing prosecution in Austria of several former BAWAG executives and ÖGB officials.

49. Shortly after the loan documents were apparently drafted, the fraud that tainted the funds was uncovered by Austrian and United States law enforcement officials, leaving RHL in custody of $50,000,000 that is due and owing to Bensor in 2015.

50. As a result of this discovery of the fraud, the loan obligation owed by RHL was not transferred from Bensor to Bagani and, similarly, neither Bagani nor any other party transferred funds to JMV-FIA to invest on October 10, 2005.

51. In or around October 2005, SCML received a copy of a new Note that clearly states that the funds contemplated under the 2005 Note were already held and being managed by Austost Anstalt, a BAWAG-controlled entity.

9

52. Nonetheless, Bagani has now mislead the Anguilla Court into believing that it has a right to the $50 million held by RHL pursuant to the ZCPPC originally loaned to JMV-FIA by Bensor.

53. Bagani likewise misled this Court about the nature and purpose of the transactions as well as about its own entitlement to the funds being held by RHL.

54. Since 2007, Bagani, acting on behalf of those identified above, has attempted to induce SCML to send it certain payments totaling about $1.7 million from the loan transactions, claiming that it had in fact purchased the Bensor bond and JMV-FIA Note. The amounts claimed were proceeds from an option set forth in the Note automatically exercised each year.

55. JMV-FIA owes those proceeds to the party properly entitled to the future interest in the monies held by RHL, and has endeavored, in good faith, to discover the proper party to disburse them to.

56. Many factors, in addition to becoming aware of the complicity of those involved with the JMV-FIA transaction in the international fraudulent banking activities noted above, made SCML suspicious of Bagani, ÖGB and the others.

57. The unnecessarily complicated nature of the transaction in 2005, as dictated by BAWAG, and supported by ÖGB, Bensor and Bagani, generated concern.

58. SCML's skepticism about Bagani and its apparent co-conspirators was reinforced in May of 2006 when findings by the Austrian Government were published in an Austrian National Bank Audit Report about these actors' activities.

59. SCML's concerns were again reinforced when SCML received written communication dated May 2, 2007 from KPMG, BAWAG's auditor, that explicitly stated that the funds that were at the time, and are now, being claimed by Bagani on behalf of ÖGB in fact belonged to Bensor and BAWAG.

60. As a result of its concerns, SCML has requested, on numerous occasions (over the course of years) and pursuant to its obligations under the Patriot Act, domestic and international money laundering statutes and regulations, that Bagani provide certain due diligence information, including an opinion of counsel letter, representing that Bagani in fact has any entitlement to the funds represented by the ZCPPC for the JMV-FIA loan transaction and which had been loaned by Bensor to RHL.

61. Those requests, made both in writing and orally, were to the very attorneys involved in this litigation acting on behalf of Bagani, Alexander Schoeller and Harry Wiggin.

62. During the two-year span in which SCML has been requesting the due diligence information from Bagani to justify its claims, SCML has been open about its concerns, the status of the funds, the existence of reports and the location of the funds at issue.

63. SCML has also notified Bagani that it would forward requisite periodic reports regarding the loan proceeds and transfer funds due and owing pursuant to the loan transaction upon receipt of the due diligence information. These communications have been both written and oral, with SCML representatives making at least two visits to Anguilla for this purpose and one visit to Vienna, Austria, where they traveled to the offices of Mr. Schoeller only to be told that Mr. Schoeller would not be attending a meeting for the purpose of completing SCML's due diligence legal obligations.

64. Bagani has *never* provided the necessary information.

65. There has been a torrent of publicity relating to BAWAG and Refco and the criminal and fraudulent activities relating to the operation of those two entities.

66. The Refco/BAWAG/ÖGB catastrophe has brought damage exceeding $30 million to SCML's business as well as to the standing and reputations of literally everyone involved with SCML solely because of its business relationships with BAWAG and ÖGB.

## F. The Indemnification Agreement and the Escrow Account

67. Bensor and BAWAG's counsel drafted and presented to SCML, and SCML accepted, an indemnification for any damages or financial injury incurred as a result of its dealings with the counterparties involved in the JMV loan transaction. That protection is set forth in the 2004 Asset Holding and Management Agreement and the Investment Advisory Agreement.

68. On or about August 11, 2006, SCML and RHL entered into a Ratification and Amendment Agreement, clarifying the prior Investment Advisory Agreement and which, among other things, stated as follows: "[I]t has come to [SCML's] and [RHL's] attention that a series of investigations and civil and criminal proceedings in multiple jurisdictions have been commenced that implicate or relate to … Österreichischer Gewerkschaftsbund and its agents and affiliates (collectively, the "ÖGB"), Refco, Inc. and its agents and affiliates (collectively, "Refco") and Bank fur Arbeit und Wirschaft, AG and BAWAG PSK Bank and their agents and affiliates (collectively, "BAWAG") and which have already caused [SCML] to incur significant expenses, losses and damages …."

69. The Indemnification Agreement further provided as follows: "... it is expected and contemplated that such investigations and civil and criminal proceedings will continue, grow and multiply in the future, thereby causing [SCML] ... to incur further significant expenses, losses, liabilities and damages ... estimated to be in excess of over $30,000,000...."

70. An escrow account was created pursuant to this agreement in the amount of $30,000,000, "for purposes of paying any and all indemnification, costs and/or damage claims submitted by [SCML] ...."relating, among other things, to the activities of ÖGB, Refco and/or BAWAG. Written notice of the escrow account was provided to all relevant parties. The transaction was completely transparent.

### G. The Anguillan Order

71. On May 5, 2008, without any attempt to contact SCML's, JMV-FIA's or RHL's attorneys, Mr. Wiggin, an attorney in Anguilla who represented himself to be counsel to Bagani, finalized an agreement with Mr. Ratner, the Receiver, engaging him to serve as a potential interim receiver in a planned action against SCML, JMV-FIA and RHL.

72. Based on the agreement between the Receiver and Bagani, the Receiver's fees are to be paid out of the corpus of the same assets the Receiver has been appointed to preserve and protect. Upon information and belief, this is an unusual method of receivership compensation under Anguillan law. In the event that Bagani does not recover any assets as a result of the receivership, Bagani has agreed to pay the Receiver's fees.

73. At the same time, the restraints on the funds make it impossible for Plaintiffs adequately to safeguard their own rights.

74. On July 7, 2008, two months after engaging the Receiver to participate in the plan to appoint an interim receiver in order to circumvent the Directors and Shareholders of JMV-FIA and RHL, as well as SCML, Mr. Wiggin, purportedly on behalf of Bagani, submitted an *ex parte* Notice of Application requesting the appointment of a receiver for JMV-FIA and RHL in the Eastern Caribbean Supreme Court High Court of Justice, Anguilla Circuit ("Anguillan Court"), and, moreover, inexplicably named SCML as a party notwithstanding that it has no presence in that jurisdiction.

75. JMV-FIA, RHL and SCML, and counsel for those companies with whom Bagani has been in contact for the last several years, were not given notice of Bagani's Notice of Application in the Anguillan Court. As a result, none were afforded an opportunity to rebut Bagani's claims in the Anguillan Court, or to be heard at all.

76. Moreover, SCML, as alleged above, is a Bahamian entity, does no business with any other entity that does business in Anguilla, has no presence in Anguilla, and clearly is not within the jurisdiction of the Anguillan courts.

77. On July 9, 2008, Mr. Ratner was appointed by the Anguillan Court as an interim receiver for JMV-FIA and RHL at Bagani's request. Neither company had any notice of the appointment.

78. The July 9, 2008 order permits the Receiver, among other things, to take control of all assets and manage them as he considers necessary, to take control of all issued shares and exercise all voting rights attached to those shares, to remove the directors of both companies and replace them with directors chosen by the receiver, to act in the name of, and on behalf of the companies in all matters, and to bring legal actions in the name of both companies.

79. No appropriate bond was posted with the Anguillan Court to insulate JMV-FIA or RHL from the potential harm that could result, and already has resulted, from the Receiver's actions.

H. **The Missouri Action**

80. On July 10, 2008, the Receiver filed a Verified Complaint for declaratory judgment, accounting, constructive trust and injunctive relief before this Court (the "Complaint"), naming bank accounts belonging to JMV-FIA and RHL as Defendants.

81. The Receiver relied on the same misrepresentations and omissions in his Verified Complaint for declaratory judgment in this Court that Bagani made to the Anguillan Court in order to secure the appointment of the Receiver. The Receiver, representing to the Court that Bagani has a legitimate claim to the funds held by JMV-FIA and RHL, failed to disclose to the Court the fact that no contractual relationship exists between Bagani and SCML, JMV-FIA or

RHL, or the fact that representatives for all parties have been in communication about the circumstances at hand continuously over the last several years.

82. The Complaint filed with this Court by the Receiver sought an *ex parte* temporary retraining order, again without notice to JMV-FIA or RHL, in order to freeze the bank accounts belonging to JMV-FIA and RHL at UMB Bank, N.A. and J.P. Morgan Chase, N.A.

83. This Court issued an *ex parte* temporary restraining order on July 10, 2008. The effected parties, again, were not afforded an opportunity to be heard, and their rebuttal to the Receiver's plain misstatements of fact to this Court was not heard before the Order was issued.

84. No appropriate bond was posted with this Court to insulate JMV-FIA or RHL from the potential harm that could result, and already has resulted, from the Receiver's actions.

85. The Directors and Shareholders first learned of the Anguillan Court's Order, the appointment of the Receiver, and the existence of the temporary restraining order issued by this Court, on July 11, 2008.

86. JMV-FIA and RHL have suffered a complete inability to transact business and remain a going concern as a result of the freeze imposed on their bank accounts in Missouri, and the viability of their investment manager, SCML, has been threatened.

### III.

### CLAIMS

#### As and for a First Claim for Relief

**(Breach of Fiduciary Duty)**

87. The Directors and Shareholders repeat and incorporate the allegations set forth in paragraphs 1-86 above.

88. The Receiver has a duty to act as an impartial officer of the Court and to carry out the orders of the Court in an unprejudiced and disinterested fashion.

89. The Receiver has a fiduciary duty to serve the interests of the assets and to protect the interests of all potentially interested parties equitably.

90. The Receiver is neither impartial nor neutral. The Receiver acts for and on behalf of Bagani.

91. The Receiver breached his fiduciary duty as interim receiver to protect the interests of all parties fairly. Specifically, Mr. Ratner breached his fiduciary duty to the Directors and Shareholders when he sought and obtained a temporary restraining order on the accounts at UMB and J.P. Morgan on the basis that there was an immediate and dangerous threat to the funds in question. Mr. Ratner knew no such threat existed or willfully ignored the fact that no such threat existed.

92. Mr. Ratner further breached his fiduciary duty when he sought, upon information and belief, at the request of the purported representatives of Bagani, an *ex parte* temporary restraining order.

93. Mr. Ratner breached his fiduciary duty when he caused this Court to issue a temporary restraining order against JMV-FIA's and RHL's accounts with UMB and J.P. Morgan based on representations that did not afford the Court an accurate understanding of the nature of the relationship involving JMV-FIA, RHL and Bagani or, indeed, the control of the Receiver's actions by Bagani.

94. The actions the Receiver has taken to freeze JMV-FIA's and RHL's accounts have not served to protect either the best interests of the assets themselves or the Plaintiff's interests. The Receiver's actions have been singularly calculated to benefit Bagani.

95. The temporary restraining order sought by the Receiver at the direction of the purported representatives of Bagani, rather than protecting the funds in the Missouri accounts, prevents the Plaintiffs from performing their own fiduciary obligations to manage the funds in

16
Case 4:08-cv-00538-HFS    Document 1    Filed 07/25/08    Page 16 of 19

the Missouri accounts and ensure they are properly invested and maintained. As a result, funds are being actively diminished.

96. The Receiver's failure to exercise reasonable diligence in his role as Receiver has impaired the Plaintiffs' ability to conduct their business, perform their obligations, maintain their businesses as a going concern and imminently threatens the existence of the investment manager, SCML, and its sub-advisors.

97. Without notice to the Plaintiffs, an *ex parte* hearing was held by the Anguillan Court to evaluate whether there was an immediate and extreme need to seize control of JMV-FIA and RHL and to appoint an interim receiver.

98. The Plaintiffs did not have an opportunity to rebut the misleading and incomplete set of facts presented to the Anguillan Court and as such they were deprived due process.

99. Again, without notice to Plaintiffs, the improperly appointed Receiver sought an *ex parte* temporary restraining order in this Court, again depriving Plaintiffs of the opportunity to be heard.

100. As a direct result of the Receiver's actions and breaches, the Directors and Shareholders and SCML have suffered damages and have been prevented from exercising their fiduciary duties and have compromised not only the existence of JMV-FIA and RHL, but also the existence of their investment manager, SCML.

## IV.

## <u>REQUEST FOR RELIEF</u>

101. The Plaintiffs respectfully request that this Court enter judgment in their favor, granting the following relief:

a. a judgment in favor of Plaintiffs against the Receiver for an amount in excess of $75,000.00 in compensatory damages, the precise amount to be determined at trial;

b. an order compelling the Receiver to post an appropriate bond to protect the Plaintiffs from his actions;

c. an order compelling the Receiver to release the funds he has caused to be restrained and enjoining him from restraining any further assets;

d. an order compelling the Receiver to pay all fees due and owing to the Plaintiffs' advisors and vendors and compelling the Receiver to maintain current payments until such time that the Anguillan Order can be challenged;

e. awarding Plaintiffs reasonable attorney's fees and costs; and

f. granting such other and further relief as this Court deems just and equitable under the circumstances.

Respectfully submitted,

Dated: July 25, 2008

SHOOK, HARDY & BACON, LLP

By:    /s/ Robert J. McCully
Robert J. McCully
2555 Grand Blvd.
Kansas City, Missouri 64108
Telephone: (816) 559-2191
Facsimile: (816) 421-5547

*Attorneys for the Directors and Shareholders of JMV Fixed Income Arbitrage Performance Partners, Ltd., the Directors and Shareholders of RHL Holdings Limited, and SIAM Capital Management Ltd.*

Of Counsel:
Peter R. Ginsberg
Christina N. Burgos
CROWELL & MORING LLP
153 East 53rd Street
New York, New York 10019
Telephone: (212) 223-4000
 Facsimile:   (212) 223-4134